LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
CORRECTIONS SERVICES

CASE NUMBER:  LSP-2011-1621

SECOND STEP RESPONSE FORM
(HEADQUARTERS)

TO:  <u>JEANLOUIS, GREGORY    121703</u>                    <u>LSP</u>
     Inmate Name and Number                         Living Unit

Response to Request Dated 08/17/2011, Received in this Office on 09/08/2011:

Your request for an Administrative review of ARP# LSP-2011-1621 has been received.  A qualified member of the Headquarters staff has reviewed your request in order to render a fair and impartial response.

It has been determined that your complaint is without merit.  The Medical staff has addressed your concerns in an appropriate manner and in accordance with Health Care Policy # B-06-001.  Medical opinion is controlling.  The care you have received as well as the care you will continue to receive from the Medical staff is determined adequate for your health care concerns.  As such, this office has accepted staff's position in this matter and concurs with the response provided at the First Level.  Therefore, administrative intervention is not forthcoming.

Your request for relief is denied.

_____                _____
               Date                         Secretary's Signature or His Designee

CASE NUMBER: LSP-2011-1621

FIRST STEP RESPONSE FORM (FIRST STEP RESPONDENT)

TO: JEANLOUIS, GREGORY 121703          C JAG 1/R
                                       Living Quarters

Response to request dated 07/09/2011, received in this office on 07/10/2011

This is in response to your ARP 2011-1621. This office has reviewed your allegations and an investigation into this matter has been conducted. The extensive documentation in your current medical record indicates that you have been afforded the opportunity to address your concerns with professional staff in a manner that is consistent with guidelines set by LSP Policy. Documentation supports that you have been followed on a regular basis in the Physician's Clinic and have a pending appointment scheduled in the Orthopedic Clinic. You have made sick call numerous times and you have been referred to the Eye Clinic for eyeglasses. The members of the Medical Staff have responded to your situation in accordance with LSP Policy and your level of need.

You have failed to provide evidence to substantiate your allegation of deliberate indifference or that your care has not met acceptable standards of care. I find no evidence to support your claim that your Rights have been violated or that you have subjected to cruel and unusual punishment. There is no documentation to support that you have been denied medical access. Prevailing medical opinion is that your medical concerns have been and continue to be addressed. While your concerns are appreciated, your complaints and allegations are invalid and unfounded.
If you have concerns related to your housing assignment or your location of incarceration, this matter would be better addressed through the Classification Department, which handles housing assignments and changes.
You have and will continue to receive adequate, professional health care services based on your level of need and in accordance with LSP Policy and Procedure. If your concerns should persist and/or worsen, you are advised to see sick call in your assigned living area.

As you have failed to provide proof of any wrongdoing, your request for relief is denied.

Prepared by: _____

                    Kenneth Norris

         Assistant Warden Health Services

_____          _____
           Date                              Unit Head

Instructions to Inmate: If you are not satisfied with this response, you may go to Step Two by checking below and forwarding to the ARP Screening Officer in the manila envelope within 5 days of your receipt of this decision.

☒ I am not satisfied with this response and wish to proceed to Step Two.

Reason:

See attached page 3 through 12

August 17, 2011
Date

Inmate's Signature    DOC#    121703

Today the institution holds that Jeanlouis' concerns related to his serious medical condition(s), -- in this case, the unbearable pain in his right leg and left-thumb --, and its triage system it utilizes for furnishing medical care to its inmate population [ can never ] be the subject of the protections afforded by the Eight Amendment. The institution also held that "prevailing medical opinion is that (Jeanlouis') ~~complaints and allegations~~ concerns have been and continue to be addressed, and in the same breath, it advises Jeanlouis that if his concerns should persist and/or worsen, to see sick call in his assigned living area. It further held that if Jeanlouis have concerns related to his housing assignment or his location of in-carceration, this matter would be better addressed through the Classification Department, which handles housing assignments and changes.

2.

The history of the Eight Amendment is well known. An examination of the history of the Amendment and the decisions of the United States Supreme Court construing the proscription against cruel and unusual punishment confirms that it was designed to protect those convicted of crimes. This reflects a societal judgment that there are some punishments that are so barbaric and inhumane that 'society' will not permit them to be imposed on anyone, no matter how opprobrious the offense. See Robinson v California, 370 US 660, 676 (1962)(DOUGLAS, J., concurring)(incarceration as a criminal for addiction to narcotics). Simply put, the Eight Amendment places a flat prohibition against the infliction of "cruel and unusual punishment.

Some punishments, though not labeled "criminal" by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eight A̶d̶m̶ Amendment CF In re Gault, 387 US 7 (1967).. In Estelle v Garble, 429 US 97 (1976)(incarcerated without medical care),

3.

the Court held that "deliberate indifference to the medical needs of prisoners" by prison officials constitutes cruel and unusual punishment prohibited by the Eight Amendment. Such deliberate indifference to a prisoner's medical needs clearly is not punishment inflicted for the commission of a crime; it is merely misconduct by a prison official. E.g. on April 25, 2011, after EMT U.S. referred him to the Treatment Center for the unbearable pain in his lower-back, despite Jeanlouis informing the correctional officer on D-team, who is a supervising officer, that he (Jeanlouis) was incapable of walking and his need for wheel-chair aid, the Supervisor for D-team, threaten to ~~use~~ spray chemical agent in Jeanlouis' eye (~~capital~~ corporal punishment), thus forcing Jeanlouis to walk from Camp C Jaguar Unit -- about 1/2 mile -- to Camp C Sallyport. Upon returning from the Treatment Center and receiving ~~two~~ shots to the ~~hips~~ hips, Jeanlouis' leg have not been the same since. Now see Knecht t Gillman, 488 F 2d 1136, 1139-1140 (CA 8 1973)(injection of vomit-inducing drug as part of aversion therapy held to be

4.

cruel and unusual)

As stated in the instant complaint (#11-1621)
the Louisiana Department of Public Safety and
Correction (LDPSC), has a custom or policy
of vesting complete authority to the
EMTs (Emergency Medical Technician), or
with security guard supervisors, when the
delivery of medical service to inmates
at LSP (Louisiana State Penitentiary) will
be administered to the inmate(s). Generally,
medication, [such as antibiotics], are dis-
pensed by EMT, based on their own inter-
pretation of patient(s) (inmates) needs, and
without physician order. Physician, in
certain circumstances, are not consulted or
informed before potentically harmful
medication are administered. Id at 4-5.
    > these practices violates the standard
for institutional health care delivery of
the American Public Health Association
and are likely to result in serious
injury to inmate population (as did to
Jeanlouis), >    On June 2011 (Tuesday),
health officials said, "the cholesterol-lowering
drug [simvastatin] can cause serve muscle
damage and should not be prescribed in

high doses to patients who have taken it for less than a year or in any dose to people ~~tettting~~ taking certain drugs. ___ for every three patients protected from cardiac events by the drug, one patient suffered muscle damage, says Steven Nissen, chief of cardiology at the Cleveland Clinic. (Now see Exhibit "A" — The USA TODAY, Cholestrol drug can domage muscle in high doses, June 9, 2011, p 7D)    > Also new data in Miami florida, shows that prescription-drug deaths in the State increased nearly 9% last year compared to 2009. despite aggressive efforts to edusate people about ~~the~~ dangers and a crackdown on illegal distribution,

LDPSC is expressly autherize to adopt rules governing inmates conduct and policies for opportunitaes for inmates to accerr "medical concerns" in a ~~menner~~ manner ~~easil~~ consistent with guidlines set by state and federal laws. In addition to medical ~~the~~ Treatment Center at LSP Le RE Barrow Treatmnt Center, also provides, psychological and dental centers. Dental care can be ~~recewwed~~ recenied using

6.

the same procedure as medical care, currently being utilize at LSP. Psychological care may be recerved by requesting to see a social worker in the inmate's housing area, by contacting security officers. And inmates may also see mental health staff through the form mail.

Sadden-to-say, on April 11, 2011 -- the date this incident begin -- another inmate, a 'tier walker, discovered the body of inmate Jeron Ausbon, 32, in his cell in the Hawk Unit of Angola's Camp D, after an apparent~~apparent~~ apparent suicide-hanging. →West Feliciana Parish sheriff's detectives are investigating the Monday hanging at Angola→
    On informatiou, at the time of the alleged hanging, LSP had ~~one~~ one (emphasis added) Psychiatrist employed, however, at this present time, LDPSC has [NO PSYCHIARIST] employed at its 5,200 inmate facility.

Additionally, its also saddened, that on abort August 1, 2011, another inmate was found unresponsive in his cell at Cellblock D (Administration Segregation) of Angola's Main Prison Complex, and later pronounced dead.

7.

Upon information, the inmate (Name not available) had been laying on the cell floor for days in human-waste. At one point, an Assistant Warden at Mem ~~Prison~~ Prison noticed the inmate on the floor and stated, "He's stunning" (also known to mean "Faking"). The prison officers who more likely than not, have no medical training casually walked passed the dying (or dead) inmate without summoning medical attention.

In its first-step response, the institution stated that after Reviewing Jeanlouis' allegations and an investigation into the matter, "extensive documentation in his current medical record indicates that he have ~~has~~ been afforded the opportunity to address his concerns with professional staff in a manner that is consistent with guidelines set by LSP Policy." However, because LSP has a Policy of inmates having to address their medical concerns in the open presence of other inmates and security guards, an inmates' medical concerns are not confidential, thus, inmates are unable to truly have an opportunity to address their concerns to EMTs or Physicians and Nursing staff.

8.

At one point, while at Camp C Doctor Clinic, while expressing his frustration to Dr Collins, about the lack of medical care and treatment for his leg, and Dr. Collins continuous allegation that he's unable to see any X-ray results in Jeanlovis' ~~his~~ medical record, a female security officer, walked into the open-door room and asked the doctor if he wanted to have him (Jeanlovis) brought back to his ~~loc~~ assigned living area.

The first-step response further stated that "there is no documentation to support that 'Jeanlovis' have been denied medical access. However, the institution losing sight, that no medical access, will result in, no documentation. Example, in Jeanlovis' current medical record, there is NO DOCUMENTATION indicating that Jeanlovis was brought to his annual (every July) Hepatitis C Virus checkup at the Hepatitis Clinic, this year.

The prisoner's conviction entitles the State to classify him as a "criminal," and his ~~civil~~ incarceration deprives him of the

9.

freedom "to be with family and friends and to form the other enduring attachments of normal life." Morrissey v Brewer, 408 US 471, 482 (1972); Meachum v Fano, 427 US 215, 224-225 (1976). Prison brutality, as some court have observed, is "part of the total punishment to which the individual is being subjected for his crime and, as such, is a proper subject for Eight Amendment scrutiny." 525 F2d at 915. Even so, the protection offorded by the Eight Amendment is limited. After inserceration, only the "unnecessary and wanton infliction of pain," Estelle v Goble Gamble, 429 US at 103, quoting Gregg v Georgia, 428 US 153, 173 (1976), constitute cruel and unusol punish-ment forbidden by the Eight Amendment.

It is alleged that Jeanlouis have a pending appointment scheduled in the Ortho-pedic Clinic, and been refured to the Eye Clinic for eyeglasses. However, after conversing with Dr Collins, its painfully apparent that LDPSC is not fulfilling its obligation of the consent agreement in William v Edwards, 547 F2d 1206 (CA5 (La) 1977). See Rule 60(b)(5) Fed R CivP.

10.

According to Dr Collins, the waiting list of inmates' schedule appointment to the Orthopedic Clinic is so long, that Jeanlovis' pending appointment will amount to nothing leat than "unnecessary and wonton infliction of pain"

Finally, in respect to Jeanlovis' concerns related to his housing assignment on his location of incarceration, and addressing it through the Classification Department, Jeanlovis now arset that it would be futile to bring this concern to the Classification Department. For one reason, upon Jeanlovis' arrival back to LSP via Elyan Hunt Correctional Center on January 22, 2007, Jeanlovis currently is still not officially classified. He has been denied the reclass board from his current conditions of Extended Lockdown for the same reasons i.e. Initial Classification in Extended Lockdown. Moreover, all transfer request to other institutions of the Department must be approved by the Office of Adult Service (Headquarter). Now see

<u>See La RS 15:824</u>

116

the classification process at LSP is currently incapable of fulfilling any of its functions, and is inadequate under any minimum standards. It has deteriorated drastically over the past years, and for all practical purposes have effectively ceased to function at all, contrary to the requirements of state law. It's duty is to function with security in maintaining custody, control and management of inmates.

As long as LDPSC's rule and regulations/ policies are close to public (or court's) scrutiny, there is no reason to believe that the above-described concern in this instant complaint will be <u>rectified</u>

THEREFORE For the foregoing reason, Jeanlouis is not satisfied with this response, and shall now go to step Two.

END OF RESPONSE

12.

Exhibit 'A'

7D    **USA TODAY**    THURSDAY, JUNE 9, 2011

# Cholesterol drug can damage muscles in high doses

## Simvastatin takers should see doctor

By Steve Sternberg
USA TODAY

The cholesterol-lowering drug sim-vastatin can cause severe muscle dam-age and should not be prescribed in high doses to patients who have taken it for less than a year or in any dose to people taking certain drugs, health officials said Tuesday.

Simvastatin is the second-most-prescribed drug in the USA. It is sold by itself as Zocor and in combination with another cholesterol-lowering drug, ezetimibe, as Vytorin.

Last year, doctors wrote 94 million prescriptions for the two brand-name drugs, according to IMS Health, which tracks the medical marketplace. Millions more people take generic versions of the drug, says Michael Rosenblatt, chief medical officer of Merck & Co. Inc., the company that developed simvastatin.

Rosenblatt says it is crucial to alert people taking the drug to the link be-tween simvastatin and muscle damage, which was bolstered by a Food and Drug Administration review announced last March.

Research has shown that the highest dose of simvastatin, 80 milligrams, causes muscle damage in 61 of every 1,000 patients, far higher than the eight-per-10,000 rate in patients taking a 40-milligram dose, Rosenblatt says.

About 12% of people taking Merck's simvastatin, or 1.2 million people, are taking the 80-milligram dose. "We really want to get the word out," he says.

The FDA said any patient now taking the 80-milligram dose of simvastatin who has been on it less than a year should be switched to a different choles-terol-lowering statin of equal potency. Patients taking any dose of simvastatin who are also taking certain anti-fungal drugs, antibiotics or protease inhibitors for treating HIV should also be switched to other statins.

Patients taking certain heart drugs should be switched to a lower dose.

"We don't want patients stopping their medicine on their own. We want them to call their doctors," Rosenblatt says. "If they're on this medicine, they're at high risk of cardiac events."

All of the statins have been linked with muscle injury and rare cases of muscle breakdown, a condition called rhabdomyolysis, which occurs in about five of every 100,000 patients taking cholesterol-lowering statin drugs.

A decade after simvastatin was ap-proved as Zocor in 1991, Merck added a warning about muscle injury to its label, Rosenblatt says. In 2004, the biggest study of high-dose statin therapy raised new concerns.

The study, published in the *Journal of the American Medical Association*, found that high-dose simvastatin was associ-ated with an "unusually high rate of muscle damage."

For every three patients protected from cardiac events by the drug, one patient suffered muscle damage, says Steven Nissen, chief of cardiology at the Cleveland Clinic.

Nissen calls the FDA labeling change "seven years late."

Merck has established a website with patient information at simvastatininfo center.com.



**Widely prescribed:** The FDA says those on 80 mg of simvastatin, including Zocor, for less than a year should switch drugs.

2006 photo by Bloomberg News

2011-1621

DWCC Form: 135

Medical

ARP-1

ADMINSTRATIVE REMEDY PROCEDURE

THIS IS A REQUEST FOR ADMINISTRATIVE REMEDY

Gregory Jeanlouis  121703
Inmate's Name          DOC #

April 11, 2011 - ongoing / Medic,
Date of In RECEIVED

C - Jag 7/R - ongoing - Medical)
Place and Time of Incident/Complaint

JUL 10 2011

LEGAL PROGRAMS DEPARTMENT

Describe Nature of Complaint (i.e. WHO, WHAT, WHEN, WHERE, and HOW)

THIS IS AN EMERGENCY ADMISTRATIVE - REQUESTED FOR ADMINISTRATIVE REMEDY (ARP), Failure to hear this ARP in on expedited manner may result in irreparable harm.

Pursuant to 42 U.S.C. Section 1997 et seq the Louisiana legistature enacted LSA-RS 15:1171 et seq, the enabling statute authorizing the Louisiana Department of Public Safety and Correction (LDPSC)

July 7, 2011
Date

Inmate's Signature        DOC #
C - Jag 7/R  P7

TO: _____
        Inmate's Name and DOC #

( )   ACCEPTED:        Please respond to the inmate within 40 days.

( )   REJECTED:        Your request has been rejected for the following reason:

_____
_____
_____

Date _____        ARP Screening Officer

to promulgate an Administrative Remedy Procedure[14] (ARP) for inmates' complaints against the state. > The enabling statute provides that the ARP will dispose of all inmates complaints and grievances against the state and that "[s]uch complaints and grievances include but are not

limited to any and all claims seeking monetary, injunctive, declaratory, or any other form of relief authorized by law and by way of illustration includes actions pertaining to condition of confinement, personal injuries, medical malpractice, [and] time computations." LSA-RS 15:1171(B)

The primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation Johnson v Johnson, 385 F3d 503, 522 (CA5 2004)(quoting Jones v. Brock, 549 US 199, 219 (2007) > That being said, Gregory Jeanlouis (sometimes refr to as "Complainant") will not provide particular officials/employees' name in this Complaint herein, due to fear of retaliation, injuries, and/or the continuous pattern in the past of, any official/employee who violates Jeanlouis' constitutional right, getting job promotions.

Prior to April 11, 2011 -- exactly nine (9) year to the date of this institution (LSP), in contempt of court order, ~~refused~~ refused to bring

2.

Jeanlouis to his long-awaited Post-Conviction Relief Hearing -- Jeanlouis has submitted myriad Complaints (ARP), claiming that he fear for his personal health and safety, due to his serious medical condition of, inter alia, advance-stage Hepatitis C Virus (Hep-C), and the myriad "excessive force" used against him by the correctional officers here at Louisiana State Prison (LSP), as a result of him availing the ARP system. As a result of the LDPSC's deliberate indifference to his serious medical needs, Complainant has requested on countless occasions, that he be immediately transfer back to the Lafayette Parish Correctional Center (LPCC) at Lafayette, Louisiana, to restart restart the life-saving Hep-C Treatment. In the alternative, that he return to Elayn Hunt Correctional Center (EHCC) at St. Gabriel, Louisiana, to complete his votech votech classes See LSA-RS 15:824

The prohibition against cruel and unusual punishment contained in the Eight Amendment applicable to the State of Louisiana through the Due Process Clause of the Fourteenth Amendment Robinson v California, 370 US 660 (1962), is not limited to specific acts directed at selected

3.

individuals, but is equally pertinent to general conditions of confinement that may prevail at a prison.

The medical staff and available facilities fail to provide adequate medical care for the inmates population. As a result many inmates have not received prompt or efficient medical examination, treatment, or medication. Unsanitary conditions are rampant. Some inmate with ~~serious~~ serious contagious diseases are allowed to mingle with the general prison population; other inmates have developed complications from lack of medical ~~treatment~~. Inmates are often discouraged from ~~seeking~~ seeking medical attention by the prison practise of punishing those who on examination appear to be healthy.

LDPSC has a custom or policy of vesting complete authority with the Emergency ~~Technician~~ Medical Technician [EMT] (or with Correctional officer Supervisor) when the delivery of medical service to inmates at LSP, would be administered to inmates. For example, medication, routinely requires a physician

4.

prescriptions are genr generally dispensed at LSP by EMTs, based on their own interpretation of patient needs, and without physician's order. Physicians are not consulted or informed before potentially harmful medication, including tranquilizers and antibiotics, are administered. These practices violates the standard for institutional health care delivery of the American Public Health Association, and are likely to result in serious injury to inmate patients. ⟶ In addition, nurses, (or EMTs), on their own, without physician approval and without guidance by written instruction or policy, sometimes decide that some particular complaints are imaginary and treat them with placebos.

On April 11, Complaintent -- as directed by EMTs -- had a health care request form (sick-call sheet) ("019373) in the bars to make routine sick-call. EMT "1, who Complaintent has had trouble with in the pass, e.g. EMT "1 throwing his sick-call sheet in the trash-can, concerning possible spider-bites, disregarded his sick-call sheet, and kept walking off the tier (C-Dog ¾R '7)

5.

Consequently, Complaintant was Forced to declare himself a medical emergency for the spider-bite. Soonafter, (same) EMT #1, ~~returned~~, returned, after explaining his prouble to EMT #1, Complaintant signed his signature to sick-call sheet, however EMT #1 didn't ~~mear~~ mark a total charge (as he ~~usually~~ usually do,) and ~~left~~. = vesting of such carte blanche authority with the EMT's without ~~aqua~~ adequate (training) to recognize when medical treatment is needed ~~was~~ grossly negligent or so reckless that ~~it~~. Future EMT ~~conduct~~ missonduct was almost inevitable or substantially certain to result

After waiting almost three (3) days for medication from EMT #1, Complaintant was forced to contact the correctional officer supervisor, and declare himself a medical emergency (sick-call # 021801) on April 14, 2011. EMT #2, give Complaintant a Referral Slip to go to the prison Treatment Center, to pick up med (date of referral 4/22 - 4/26) (on until arrival at ~~pill~~ pill call). > Generally, the meds (e.g. antibiotic) are prescribed for ten (10) days duration. ~~However~~, However,

6.

because the correctional officer supervisors on B team and D team, disregarded the reason for referral, i.e. in until arrival at pill call, and only looked at the date of referral i.e. 4/14/ – 4/17, on about April 20 and 21, both B and D teams refused to allow Complaints to go to the prison Treatment Center to receive his med for the Spider-bite.

The next day, on April 22, Jeanlouis declared himself a medical emergency again to receive his med, whereat he was given another referral from April 22 – 26 ( until arrival at pill call )

On April 24, while taking his med at Treatment Center, Jeanlouis declared himself a medical emergency for unbearable pain in lower-Back.  At that point Jeanlouis was in a wheel-chair (because of the pain) After urinating for EMT "3, and waiting for the result, EMT "4 ordered Jeanlouis out the wheel-chair, whereat, the lock which was faster to the waist-chain, coming loose, EMT "4, instead of treating his medical emergency, treated him as an escapee, and

7.

refused to give him medical care and treatment for his back. (CF sick-call #016354)

Thereafter, Complaintant, on the next evening, declared himself on medical emergency for his back-pain again (see sick call sheet # 023217), EMT #5 referred Complaint to ATV. Upon arriving at the Treatment Center, Complaintant was given two-shot, one in the right-hip, and one in the left-hip. The next day, the pain in the back, moved to the right-leg. On April 27, Complaintant made a rotune sick-call, for the ~~excruciat~~ excruciating pain in his lower-back (Sick-call #014380)

On May 2, Jeanlovis met with Dr. Guy Williams at Camp C Doctor Clinic, After speaking with Dr Williams about different different medical problem, Dr William ordered back X-rays and feet ~~x-ray~~. On May 6, (Friday) Jeanlovis took the ~~x-ray~~ X-rays at the Treatment Center. Dr Willie also prescribed med.

Three (3) days before leaving to David Wade Correctional Center for the evacuation on May 12,

8.

Jeanlouis made routine sick-call for his swollen feet see sick-call # 618390 Emr #6

On May 12, 2011, after getting on the bus in route to DWCC, the bus was in a wreck, here at LSP, after the 5½ hr drive, Jeanlouis was in unbearable pain in his right leg. — Since that time, Jeanlouis Right leg is deteriorating to the point, he's unable to stand on it, for a short period of time. ( See ARP # DWCC-2011-0487 )

Upon returning from DWCC, after another 5 hr drive, Jeanlouis, on June 15, 2011, attempted to make medical emergency (prior to a fellow inmate on the same tier), however, despite the Ambulance arriving, the Correctional officer Supervisor on B team, some of whos responsible for the hate-crime against Jeanlouis last year — denied Jeanlouis access to medical care and Treatment. Later on, that evening, about 6 pm, Jeanlouis tried to make medical emergency again for his leg, however, D team refused him access to medical also. It wasn't until, the same inmate who the ambulance come for earlier medical made emergency at 2:30 Am, Jeanlouis was seen by

9.

EMT #7, on June 16. (see sick-call # 012100), That morning because EMT #7 backdated his sick-call sheet, Jeanlouis make sickcall (#016335) to see the doctor (EMT #7)

On about June 21, 2011, Jeanlouis met with Dr. Collins at the Cay C Doctor Clinic. Dr Collins alleged that he could not locate any X-ray result, so he re'order more X-ray. About June 24, 2011, Jeanlouis took more X-rays at the Treatment Center.

On June 27, EMT("8) Tammie Summers refused Jeanlouis to declare himself a medical emergency for the unbearable pain in his leg. (sick-call (#016369))

On July 5, 2011, Complaintant met again with Dr Collins. Dr Collins attempted to pretent that it was our first meeting. He also alleged that (again) he could not locate the X-ray result. However, he would refer Complaintant to an ortho-paedic (sic)

10.

It may happen that in light of the duties assigned to specfic officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of Constitutional real rights, that the policymakers of LDPSC can reasonably be said to have been deliberately indifference to the need. e.g. Tennessee v Garner, 471 US 1 (1985).

Example, on April 25, 2011, when GMT #5, rule, etpg 7 referred him to the Treatment Center for unbearable lower back-pain, despite Jeanlouis informing the correctional officer supervisor or D-team that he was unable incapable to walk to the patrol, that he needed a wheel-chair, the D team supervisor threaten to spray spray chemical agents on him, and forced Jeanlouis to walk from Camp C, Jaguar (all the way) to Sallyport, From that point, Jeanlouis' leg hasn't been the same. In that event, the failure to provide proper training may fairly be said to represent a policy for which

N.

LDPSC is responsible, and for which LDPSC may be liable if it actually causes injury City of Canton, Ohio, v Harris, 489 US 378, 390 (1989)

Jeanlouis' back and (esp Right-leg) has be exacerbated by deliberate indifference of staff member. Given the dangerously low standard of medical care that prevails at LSP, LDRSC would be remiss in its duty were to wait until Jeanlouis' leg need to be amputated, which EMTs (or correctional officer supervisors) are un-equipped to diagnose or treat in an emergency, before it acts

The Security guards has no capability of performing elementary blood or urine test, which are crucial for quick diagnosing commonly encountered medical problems among inmates for which prompt diagnosis is essential ~ The Treatment Center has no capability of performing elementary x-ray or MRI (and properly keep it), which are crucial to quick diagnosing commonly encountered medical problem among inmates,

12.

which prompt diagnosis is essential, and as a result result. medical staff cannot make an adequate emergency diagnose of an inmate having back and/or leg pain.

The size of the medical staff (esp Doctors) is inadequate by the LDPSC's own admission. There are 5200 inmates at LSP, who because of the excessive excessive violence/force at the institution, require a good deal of patching up.
  > Necessary, much of the burden of treatment (esp after hours) falls on the EMT staff, on a expedient that is medically unobjectionable, provided there is adequate supervision.
  > In practice, however, necessary training and guidance for the EMT staff is almost totally lacking, a situation which constitutes reckless disregard too, and deliberate indifference to medical need of inmates.

For the foregoing reasons Jeanlovis hope this issues in the complaint ARP is retify    Sec Lat Corr Ctr (LPCC)
                                              LPCC
        END of ARP

12.