LOUISIANA STATE PENITENTIARY

09/27/2012
(R)

ANGOLA, LOUISIANA


ARP NUMBER:  LSP - 2012 - **2972**


RE:  GREGORY JEANLOUIS     121703

LOCATION:     (J GTR 1/R)


I HEREBY ACKNOWLEDGE RECEIPT OF FORM ARP-1 REGARDING REQUEST FOR REMEDY
NUMBER LSP-2012-2972


RECEIVED BY: _____ 121703 _____
                              (INMATE'S NAME & NUMBER)

DATE RECEIVED: ___9-28-12_____

DELIVERED BY: _____

=================================================================
INSTRUCTION TO DELIVERY OFFICER:

1.    Have the inmate sign this receipt.

2.    Delivery Officer signs the receipt and dates it.

3.    Give the inmate the White envelope.

4.    Return the reciept to LEGAL PROGRAMS DEPARTMENT.


**R E C E I V E D**

OCT 0 2 2012

Legal Programs Department

LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
CORRECTIONS SERVICES
OFFENDERS RELIEF REQUEST FORM

CASE NUMBER: LSP-2012 -2972

TO:  GREGORY JEANLOUIS  121703          J GTR 1/R
        Offender's Name and Number           Living Quarters


                  6/14/2012
                  Date of Incident


                  ACCEPTED:  This request comes to you from the Wardens Office.  A response will be
                  issued within 40 days of this date.

X                 REJECTED:  Your request has been  rejected for the following reason(s):
                          YOUR ARP IS TO LONG. PLEASE SUMMARIZE AND RESUBMIT.



            09/27/2012                                    Trish Foster
              Date                                Warden's Signature or Designee

2012-2972

Reg.

# ADMINISTRATIVE REMEDY PROCEDURE

## THIS IS A REQUEST FOR ADMINISTRATIVE REMEDY

GREGORY JEANLOUIS          121703

Inmate's Name                    DOC#

**RECEIVED**

SEP 12 2012

Legal Programs Department

June 14, 2012

Date of Incident/Complaint

Camp C ;              approx. 8:30 Am

Place and Time of Incident/Complaint

Nature of Complaint

On Thurday, June 14, 2012, prison guard Cleveland Cannon, who holds the ranks of Lieutenant (Lt. Cannon), -- assigned to Camp C Patrol (mini van) -- removed Complainant ("Jeanlouis") from his cell (Jaguar 1R7) on the representation that he was going to be taken to the prison hospital.

While placing Jeanlouis and two other inmates (offenders)(one who was assigned to Administrative Segregation) in the Patrol-van to be escorted to the hospital, Lt. Cannon, leaving unattended, Jeanlouis and the other offenders sitting in the van with the radio (music) playing and the van doors open because of hot weather, began to walk

09/10/2012                                    1/28

back towards the Working Cellblock
[Tiger (3 and 4) Unit ]("an form of maximum
custody distingued by access to work and
other program consistent with security re-
strictions and institutional procedures"),
approximately 200 feet from the Patrol-van,
across from Administrative Segregation
[Tiger (1 and 2) Unit] ("a temporary holding
area, preferably a cell, where an offender is
housed when the offender's continued pre-
sence in the general population poses a threat,
to life, property, self, staff, other offenders,
the security or orderly running of the in-
stitution or the offender is the subject
of an investigation.")

However, contrary to prison policies of
leaving [unattended] inmates, such as Jeantaux,
assigned to "Disciplinary Detention / Extended
Lockdown" ("an indetermine period of de-
tention characterized by routine 90-days
classification review to determine eligibility/
suitability for release from this status. This
type of segregation is used primarily after
a Disciplinary Hearing for an offender
found guilty of violating one or more
serious rules, being dangerous to himself
or others, being a serious escape risk or
posing a clear threat to the security of
the facility"), in a patrol van out of his
sight, and waiting approx 15 minutes for

09/10/2012                          2/28

other offenders (inmates) assigned to the Working Cellblock, to be transported to the prison hospital in the (same) patrol-van with offenders assigned to (Jaguar (1 and 2) Unit)(DD/Ext/LD) and Adm. Seg. After remaining in the (hot) van for approx. 15 minutes, because of a certified medical reason, Jeanlouis stepped out the patrol-van, to alleviate the pain in his right leg and lower-back. On the day before June 13, same Lt Cannon, escorted him (Jean-louis) to the prison hospital to met with "Dr. Lee", a Chiropractor, for his weekly physical therapy.

Thereafter, as a result of seeing him out the patrol van, Lt Cannon in a loud and boisterious manner, yelled at Jeanlouis to "get back in the fucking van."! Not wanting to became disrespectful to Lt Cannon, or in a heated-argument, in response to Lt. Cannon's belligerence toward him, Jean-louis began walking towards Tiger Units and informing Lt. Cannon that he would like to refuse the hospital call-out. Upon entering the walkway ("the walk") between the Working Cellblock and Adm. Seg., while hand-cuffed and shackled and in a waist-chain ("fully-restraint"), Lt. Cannon -- in the presence of myraid of unrestrained offenders -- bodily threw and propelled Jeanlouis

09/10/2012                                3/28

into the Adm Seg building [Tiger(1 and 2)Unit] so that his face and head were caused to hit upon the side of the building.

Once inside the Adm. Seg building, Lt. Cannon (again) bodily propelled Jeanlouis into a wall adjacent to the shower on Tiger 1 Right tier (cells on one side of a hallway). After placing him (Jeanlouis) in Tiger 1 right shower, Lt. Cannon exited the building.

Only minutes later, Assistant Warden(s) (A.W.) Tim Delaney, who's over Camp C, a satelite camp here at Angola prison, and Joe Lamartinere, who's over all outter-Camp (all satelite camps outside of the Main Prison Complex), along with Ray Vittorio, who holds the rank of Colonel, who's second-in-command at Camp C, made routine round at [Tiger (1 and 2) Unit]. Upon see-ing A.W. Delaney, Jeanlouis immediately communicated to him, the above-described actions of Lt. Cannon and his humi-lating him in the presence of other offenders, while fully-restraint. He also communicated to AW Delaney the importance of the hospital-call-out, and more likely than not, he (Jeanlouis) was schedule to met with an outside specialist for one of his many heath-related disabilities.

Thereafter, upon A.W.s Delaney and La-

09/10/2012                                    4/28

martinere walking to the rear of Tiger 1 Right tier, Colonel Vittorio, who remained at the front of the tier, near the shower -- in the presence of Shuwanda Richardson, who's employed as a Master-sergeant (MSgt Richardson) -- communicated to Jeanlouis that he could complain "but keep it low." Thereafter, Jeanlouis informed Vittorio that he would like to sign the refusal (hospital callout) and return to his quarter (Jaguar 1 Right). Whereat, Col Vittorio, then instructed "Unknown" Woods who's employed as a Sergeant (Sgt Woods), and head-sergeant over (Tiger (1 and 2) Unit), to allow him (Jeanlouis) to sign the refusal (and if he refuse to sign it (refusal form), to have two persons witness same. Subsequently, A.W.s Delaney and Lamartinere and Col. Vittorio then exist (ed) the building.

Meanwhile, Sgt Woods approached Jeanlouis with the refusal form for his signature. However, upon him communicating to Sgt. Woods his readyness to return to his quarter, but before signing the form, Sgt. Woods replied that he (Jeanlouis) would not be returning to his quarter. In response to Sgt. Woods' comment Jeanlouis then replied, that if he could not return to his living quarter, he would not [voluntarily]

09/10/2012                                    5/28

sign the refusal form, because it was Lt. Cannon's fault that he could not go to his hospital callout.

Sometimes later, Lt. Cannon returned to Tiger 1 Right shower, whereat, he communicated to Jeanlouis that he would be going to his callout (hospital) alone. After checking to see which key was the correct one for the padlock to the waist-chain Jeanlouis was wearing, Lt. Cannon once again, exist[ed] the building.

Meanwhile, as he was speaking to his fellow-inmates, asking questions like: Do the working Cellblock and inmates assigned to Jaguar Unit (DD/Ext/LO) and/or Adm. Seg. supposed to ride in the [same] Patrol-van being escorted to the prison hospital, at the [same] time? And speaking of, Lt. Cannon's actions of [some] the day before and how was he (Lt. Cannon) ~~was~~ going to explain that he left unattended, inmates assigned to Maximum Custody in a Patrol-van, some 200 feet away, with the music (radio) playing and doors wide-open, thus not only creating a substantial risk to these offenders' safety, but also, creating an escape hazard!!!

Upon Sgt. Richardson, who also, like Sgt. Woods, was assigned to [Tiger (2-side) Unit] that date, hearing this, she ap-

09/10/2012                    6/28

proached Tiger 1 Right shower and there-after, (threaten) Jeanlouis that if he didn't stop talking with the other in-mates, she would have those people come spray him down! After bring to her attention that earlier in her present ante at 4-5, Col. Vittorio said I could talk (complain) but only keep it low! Msgt. Richardson then walked away from the shower.

About five minutes later, Lt. Cannon entered the building. And on the pretext of bring him on his hospital callout upon Jeanlouis approaching the bars, Lt. Cannon firmly pressed the handcuffs, as to tighten it on both wrists and sub-sequently sprayed a can of Sabre Red chimical agent directly in the face and eyes of Jeanlouis'. Out of fear for his personal safety, as he moved from the bars toward the back of the shower, (as a result of being temporarily blinded by the [mace]), Jeanlouis tripped over the "built-in platform" in the shower and slipped in the shower -- fully-restrained -- so that his head and lower-back were caused to hit upon the floor of the shower, thus causing him to suffer severe headache, and burning sensation in his eyes and skin, and aggravating an already injured-back.

09/10/2012                                    7/28

About two hours later, Daniel Davis, a guard who holds the rank of Major (Major Davis), made his routine round at [Tiger (1 and 2) Unit]. Upon seeing Major Davis, Jeanlouis (immediately) request of Davis, that he be able to take a shower because of the burning sensation in his eyes and skins, caused by being maced by guards, and afterword, be given a clean and dry jumpsuit (clothing). Upon this request, Maj. Davis asked Jeanlouis what did he get maced for?, whereat, he (Jeanlouis) replied that he didn't know! After completing his round on the Unit, only few minutes later, while speaking to fellow-inmates, Maj. Davis yelled, "Hold that fucking noice!". Not knowing he was speaking to him (Jeanlouis), Maj. Davis approached the showers area, and asked Jeanlouis "did he want some more of that gas (mace)!"? In response, Jeanlouis asked, "Why would I want to get sprayed again?" Thereafter, Maj. Davis existed the building. Needless-to-say, it wasn't until about 8:00 pm, (after shift change and the said officers (guards) went home), that he was able to take a shower and get a clean and dry jumpsuit.

Whenever mace is used, a written report of its use must be made by the correct-tional officer, giving information regarding

09/10/2012                                              8/28

Its use and the reasons therefore, in accordance with Section F of Pent. Directive No 09.002, eff. date June 27, 2011. Only the highest ranking Security Supervisor on duty in the immediate area where the incident is occurring may authorize the use of mace, and he is usually the one summoned from outside of the area where the incident is occurring E.g. Adm Seg. Excessive or improper use of a chemical agent can cause injury, during the use in Angola, there is evidence in the record or documented at Angola or the satilite camps showing serious or permanent injury from the use of a chemical agent. Inmates will generally experience itching, irritation or discomfort for period of time from its use, but washing with water will generally alleviate any discomfort. The procedure prescribed following the use of mase is to have the inmate shower, have his eyes rinsed out, and change his clothing. This usually gives immediate relief of any discomfort.

It is well settled that the "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eight Amendment." Estelle v. Gamble, 429 US 97, 104 (1976) (quoting

09/10/2012                    9/28

Gregg v Georgia, 428 US 153, 182-83 (1976))

In Estelle, the Supreme Court established the "deliberate indifference" standard. The meaning of that term was further clarified by the Supreme Court in Farmer v Brennan, 511 US 825 (1994), a case that considered its meaning with reference to a prison's duty to protect its inmates from violence at the hands of other inmates. In Farmer the Court held that "a prison official cannot be found liable under the Eight Amendment for denying an inmate humane conditions of confinement unless the officials knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw inference." Id at 837. However, "an Eight Amendment claimant need not show that a prison official acted or failed to act dispite his knowledge of a substantial risk of serious harm." Id at 842. Further, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder

09/10/2012                              10/28

may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious" Id.

Accordingly, under Estelle and Farmer deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence, but less than conduct undertaken for the very purpose of causing harm.

The objective component of an Eight Amendment claim is therefore contextual and responsive to "contemporary standard of decency." Estelle, supra, 429 U S at 103. For instance, extreme deprivation are required to make out a condition-of-confinement claim. Because routine discomfort is "part of the penalty that criminal offenders pay for their offenses against society." Rhodes v Chapman, 452 U S 337, 347 (1981) "only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eight Amendment violation." Wilson v Seiter 501 U S 294, 298 (1991)(citation omitted). A similar analysis applies to medical needs. Because society does not expect that prisoners will have unqualified access to health

09/10/2012                                        11/28

care, deliberate indifference to medical needs amounts to an Eight Amendment violation only if those needs are "serious" See Estell v Gamble, 429 U S at 103-104, but see (The (Baton Rouge) Advocate, "Majority of La. prison doctors disciplined in past" July 30, 2012 front page)("Nearly two-thirds (about 60%) of the state's prison doctors have been disciplined by the state medical board for issues ranging from pedophilia to substance abuse compared with 2% of the state's 16,000 or so licensed medical doctors. .. The Louisiana State Penitentiary at Angola is a common destination for troubled physicians") (Exhibit "A")

In the excessive force context, society's expectations are difference. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated, See Hudson v McMillian 503 U S 1, 9 (1992) "Malicious and sadistic" means evil and cruel,
In Hudson, the prisoner suffered blows that caused "bruises, swelling, loosened teeth, and a cracked dental palate Id a I. The Supreme Court found that the violence against Hudson and his injuries were serious enough to satify the "objective component" of the Eight Amendment, This provided the basic for a constitutional

09/10/2012                                    12/28

claim. But it should be notice that the Hudson Court, in finding a constitutional violation, also thought that it was important that the officer intended to humiliate the prisoner, ante at 3-4.

Soon after the Supreme Court decided Hudson, the Fifth Circuit in Flowers v Phelps held that a prisoner who was beaten by correctional officers, resulting in a sprained sprained ankle, suffered a serious enough injury to have a successful Eight Amendment claim 956 F 2d 488, 489-90 (5th Cir 1992), vacated in part on other grounds, 964 F 2d 400 (5th Cir 1992). The court stated that there is no minimum injury required for Eight Amedment claims of excessive force 956 F 2d at 491. In this way, even though a sprained ankle may not seem like a bad injury, in Flowers it was serious enough not to be de minimis.

Thus, a court will use the "malicious and sadistic" standard the Supreme Court created in Hudson v McMillian supra, to determine whether the officer's force against a prisoner was so bad (excessive) it violated the Eight Amendment. Under Hudson, a prisoner must demonstrate that the prison official's force was not "a good-faith effort to maintain or restore discipline but rather was used "maliciously and sadistically"

09/10/2012                                    13/28

to hurt the prisoner. 503 US at 6-7.

In the present case, despite prison officials' knowledge of Lt. Cannon creating an escape escape hazard by leaving maximum custody inmates [unattended] in a vehicle (Patrol van) and/or exposing Jeanlouis (as well as the other two inmates in the van) to a substantial risk of serious harm, while he (Lt. Cannon) was in the process of violating written institutional procedures i.e. escorting inmates assigned to the Working Cellblock and Disciplinary Detention / Extended Lockdown to the prison hospital at the same time, in the same Patrol van (vehicle), Ante at 1-3, the prison officials' failed to take reasonable safeguards to protect Jeanlouis from the malicious and sadistic actions of both Msgt Richardson and Lt. Cannon.

Instead, to eliminate this knowledge of this known excessive risk to Jeanlouis' health and safety, the prison officials conspired to injuried public record by way of having Lt. Cannon's supervisor, Maj. Daniel Davis falsify disciplinary report against Jeanlouis, as to cause it to appear that he was the prison guard whom sprayed the can of Sabre Red chemical agent into the shower area, because -- in accordance with Section F

09/10/2012                          14/28

of Pent. Directive No 09.002 -- Lt Cannon was not authorized to use chemical agent against any inmate. Now see (Exhibit "B") (type-written disciplinary report issued on June 14, 2012 by MAJ. Davis), compare DBA # LSP-2010-0394-W ( MAJ. Trent Barton spraying mace on Jeanlouis, and Captain Paul Smith issued a fasified disciplinary report as he sprayed the mace)

On Monday, June 18, Jeanlouis was brought before a Disciplinary Board (D.B). Colonel Ray Vittorio recused himself, sua sponte at that DB hearing. Vittorio Reasoned that since he had witnessed Jeanlouis in Tiger 1 Right showing complaining to A.W. Tim Delaney (in the presence of A.W. Joe Lamartinere), about the actions of Lt Cannon prior to being gased by security. And that he (Vittorio) could only image what happened after he left, and to be fair to him (Jeanlouis), he would have to recuse himself. On that date, Jeanlouis was remanded back to Adm. Seg. Now see Disciplinary Board hearing recordings of June 18, 2012 in DBA # LSP-2012-0349-W.

Vittorio's recusal, sua sponte, at that DB Board hearing provides evidence that the prison official had actual knowledge of the substantial risk to Jeanlouis' safety, 09/10/2012                    15/28

even, if they did not know that Lt Cannon was going to attack him. See eg Johnson v Johnson, 385 F 3d 502, 524 5ᵗʰ Cir 2004), Farmer v Brennan, 511 US at 844.

Courts also use the "deliberate in-difference" standard in claims against supervisors for inadequate supervision and control of subordinate, and against by standing officers witnessing an as-sault. e.g. Sergeant "Unknown" Woods. See also Blyden v Mancusi, 186 F 3d 252, 264 (2d Cir 1999)

To be held liable for failing to pro-tect an inmate, an official must not only know about a substantial risk of serious harm, but also fail to ~~reason~~ respond reasonably. Deliberate indifference is the failure to take reasonable pro-tective measures in response to a known risk of assult. It is not always clear what the term "reasonable" means here. Some courts have ruled that officials must eliminate a risk of harm once they learn about it. Other courts have held that a good-faith effort to address the risk of harm – even if it fails to eliminate the risk – is reasonable: all that matters is that the officials tried.

09/10/2012                    16/28

In the present case, in response to their failure on June 14, to take reasonable protective measures to a known risk of assaut, the A W Tim Delaney sitting as DB Board Chairman on June 25, eleven (11) calendar days of the date of the disciplinary reports issued by Lt. Cannon, Msgt Richardson and Maj. Davis (Exhibit "C"), in addressing the harm suffered by Jeanlouis, found him guilty on all Reports and subsequently sentenced him to (among other things) Camp J Management Program, without written reason for the sentence.

Later on that day (6/25/12), Jeanlouis was seen by the prison nurse-practitioner at Camp C Portor Clinic concerning the slip in the shower on June 14, 2012. See (Emergency) Sick-call request of June 17, 2012 no. ....... (Exhibit "D")

Three (3) days later, on that date the Supreme Court ruled that a provision of President Obama's landmark health-care law "The Affordable Care Act" concerning those in jail is constitutional see National Federation of Independent Business v Sebelius, 11-393 (US 6/28/12), on June 28, Jeanlouis who's (also) coping with health-related disabilities, including mental-illness was [exigently] transferred to Camp J (discr-

09/10/2012                                    17/28

plinary Camp). A place where -- in the past -- he was subjected to neglect and abuse (victim of hate-crime on 6-3-10 see DBA # LSP-2010-0394-w) and placed a greater health-risk by excessive heat at Camp J. Now see The Advocate "Group petition for access at Angola," Tuesday, August 21, 2012, pg 1A ("The Advocacy Center filed suit on Aug 17, 2012 in Baton Rouge federal court against prison officials at Angola, noting that some death-row inmates have health-related disabililities, including mental illness, heart problems, lung disease and diabetes. The center wants a court order that would require officials at Angola to grant center attorneys and medical specialist access to death-row inmates and record. Advocacy Center attorneys says in the civil suit that prison officials have refused to allow them to pursue prisoners report that death-row temperature have exceeded 100 degrees") (Exhibit "E")

I solating prisoners with mental-illness in Camp J Management Program for various reasons -- among them protection or discipline -- is a practice that courts have recognized as harmful See Davenport v DeRoberts 844 F 2d 1310, 1313 (7th Cir 1988) ("(T)he record shows, ... that

09/10/2012                                    18/28

isolating a human being from other human beings year after years or even months after month can cause substantial psychological damage, even if the isolation is not total"). See also The USA TODAY, "Mentally ill are sent to jail more than hospital" May 12, 2010, p 4D ("On average, 9 serious metally ill person in the USA is three times more likely to be incarcerated than hospitalized) and The USA TODAY, "Solitary confinement doesn't pay" June 14, 2010, pg 1A ("spurred by federal lawsuits over deteriorating prison conditions, Mississippi officials sharply reduced solitary confinement number in the past two years, from nearly 1,000 to about 150") (Exhibit "F")

(It is important to note that since his discriminatory and retaliatorily transfer from Elyan Hunt Correctional Center (EHCC) back to Angola prison on January 22, 2007, the date the Hepatitis Specialist was to return to EHCC to re'start the Life-saving Hepatitis Treatment, Jeanlouis was initially classified as Maximum Custody, and as a result have been in and out and in Camp J Managment Program, Four times in the last Five years, despite being placed ~~in the~~ initially (2/22/07) in the Mental-health Program at T.U. (Transistional Unit)))

09/10/2012                                    19/28

Although isolation of prisoners with mental illness is not unconstitutional as a rule, it is subject to Eight Amendment limitations. Helling v McKinney, 509 US 25, 34-35 (1993). There are certain conditions under which isolating prisoners with mental illness can cross constitutional bounds. When those conditions exist, courts will be more likely to intevene to help prisoners. For instance, courts will grow more suspicious if prisoners are segregated indefinitely without review. See Hutto v Finney, 437 US 678, 685-87 (1978) or if psychological harm threatens. Jackson v Meachum, 699 F 2d 578, 584-85 (1 Cir 1983).

        Several Federal courts have found that, even though segregation does not by itself violate the Constitution, isolation can pose particular risks for those with mental illness or on the verge of developing mental illness. Madrid v Gomez, 889 F Supp 1146, 1265 (N.D. Cal 1995). For these groups, isolation can provide extreme stress and worsen their conditions and therefore violates their rights. Ibid

        In the instant case, Jeanlouis has an interest in avoiding physical and mental deterioration. Camp J conditions are so bad, compare Exhi "E",

09/10/2012                              20/28

that serious physical or psychological deterrioration is inevitable that it constitutes "cruel and unusual punishment" proscribed by the Eight Amendment. For instance, on January 14, 2011, the very same day, the trial court (15th JDC) filed his application for post conviction relief after getting human feaces (mix with urine) thrown on him, along with two other by other inmate, same Maj. Daniel Davis, sent the other three inmate to the hospital for medical treatment (as protocal), save Jeanlouis, even-though he had personal knowledge that Jeanlouis was one of the victim(s).

Ironically, that same inmate responsible for throwing human feaces in Jeanlouis' face, was later rewarded with being transferred to his hometown of Homer, Louisiana. Whereat, despite myraid of requests to be ~~treated~~ transfer to Lafayette Parish Correctional Center to restart the Life-saving Hepatitis Treatment, prison officials continue to refuse his request. Advace stage 3 Hepatitis C gets worse and become cirrhosis (Stage 4), which is an irreparable stage, that leads to death.

The United States Constitution re-quires prison officials to provide all

09/10/2012                                    21/28

state and federal prisoners and pretrial detainees (people in prison waiting for trial) with adequate medical care. Under the Eight Amendment, the government has an obligation to provide medical care to those people whom it is punishing by incarceration. This right includes the regular care that is necessary to maintain Jeanlouis' health and safety. Many states (including Louisiana) also have statutes requiring prison to provide medical care to prisoners. See e.g. LSA - R.S. 15; 830 - 831 et seq.

Mental health care is governed by the same deliberate indifference/serious needs analysis as physical health care. Most federal circuits have held the right to adequate medical care specially specifically includes any psychiatric care that is necessary to maintain your health and safety. Medical care can be expensive, and few qualified doctors and nurses want to work in jails or prison. Thus, even the best-intentional officials get frustrated when it comes to taking care of inmates' medical needs. cf Exh. "A"

However, between June 14 and June 25, 2012, two or more person (under color 09/10/2012                                    22/28

of law) conspired to injure, oppress, threaten and intimidate Jeanlouis in his free exercise of his right secured to him by the Constitution of the United States to adequate medical care. compare 18 USC § 241 (conspiracy against rights) and § 242 (deprivation of rights under color of law).

Looking at hindsight, it's reasonable to conclude that the conspiracy begin on June 8, 2012, a Friday. On that date (6-8-12) returning from seeing the (same) nurse-prastitioner at Camp C Doctor Clinic (mentioned in the supra at   )(he later seen on June 25), for some freaky reason prison guards got the key stuck in the iron shackles (used to fasten a prisoner's ankles together). Therefore, his supervisor had to be summoned, one of which was (same) Maj. Davis.

(It is important to note that on the day before (6/7/12) Jeanlouis met for the first time, Dr. Lee, the chiropractor. And on the date before that, he submitted a Motion for Rehearing. with to Louisiana Supreme Court from the court's action of May 25, 2012 of denying his Writ Application in case no 2011-KH-2134)

09/10/2012                          23/28

Earlier that day (6-8-12) Jeanlouis ran into Col Vittorio, at the time of him making routine round. Upon speaking with Vittorio, Jeanlouis presented to him, the document he had received the night before, of the Action of the Lockdown review board, in which he and Classification Officer Platee Gooden were members. The board sheet (dated 6-5-12) reflected that Jeanlouis was not release from his Disciplinary Detension/Extended Lockdown status because of a New Rule Infractions, with a line drawn across Since Last Revie e.g ~~Since Last Review~~. Now see Exhibit "G" (same). However, a close examination of the record will reflect that Jeanlouis had not received a disciplinary report since January 8, 2012, Five (5) months before that board sheet of June 5, 2012, compare board sheet from January — May 2, 2012 (Exhibit "H")

Thereafter, on Wednesday, June 13, the day the prison guards who worked on June 8, returned from there days off, after returning from the prison hospital after seeing Dr Lee (charopractor) for his weekly physical therapy, (again) the same prison guard (Sgt Bolden of B-team) got the key stuck in the shackles, and like on June 8, the shackles had to be cut with a cutting device.

09/10/2012                                    24/28

The next day, June 14, the con-
spiracy plan which began the day
after Jeanlouis submitted his motion
for rehearing to the LSC, ante at     ,
came into fruition, ending with an
assault and battery being committed
against him.     Now see ARP request
of January 12, 2012. (date of incident 10/16/2011)
which was accepted into the ARP process
on January 27, 2012 and given the ARP
no. LSP-2012-0150 (Exhibit "I")(
First Step Response prepared by A.W. Tim
Delaney and approved by A.W. Joe Lamartin-
iere on February 14, 2012); see also DBA
# LSP-2011-0569-w.

Since his placement in Camp J Mana-
gment Program on June 28, Jeanlouis has
not be to his weekly physical therapy
for his leg and lower-back injuries.
Only last friday, September 7, he had
to declare himself a medical emergency
due to excruciating pain in his lower
back (right-side). See sick-call sheet
#042133 (HPC #68)(Exhibit "J"). On
information and belief, June was the last
month Dr Lee, the chiropractor delivered
service at Angola, because the Department
did not renew the contract.     The rights
of prisoners, like Jeanlouis, with mental-
illness, infectious disease or dis-

09/10/2012                                25/28

abilities presents special issues. In particular, denial of or delay in access to medical personell, McElligott v Foley, 182 F 3d 1248, 1256-57 (11th Cir 1999) (finding that prison repeated delays in doctor's seeing a patient with constant servere pain could constitute deliberate indifference) or in their providing treatment, McKenna v Wright, 386 F 3d 432, 437 (2d Cir 2004) (holding that extended delay in starting Hepatitis C treatment constitute an 8th Amendment claim), can be deliberate indifference. In determining whether or not a delay constitutes deliberate indifference, two factors are taken into account:

(1) the seriousness of the prisoner's need, and
(2) whether the delay was objectively serious enough to present an Eight Amendment question.

Therefore, as explained in the supra, Jeanlouis has an interest in avoiding physical and mental deterioration. The conditions of confinement are so bad at Camp J Mangement Program, that Jean-Louis, who coping with health-related disabilities, he's physical (including

09/10/2012                                    26/28

back injury) or psychological deterioration is inevitable. That being said, this Complaint/Grievance is against 'every and any one who conspired to injure, oppress, threaten and/or intimidate him in the free exercise of his right (or privilege) secured to him by the Constitution or law of the United States and State of Louisiana, because of him exercising his right to receive adequate medical care and treatment on and around June 14, 2012.

## Relief Sought

Jeanlouis pray that he be remove from Camp J Management Program upon reading of this complaint and placed in a housing area where he may receive adequate medical care for his health-related disabilities, including his mental illness. He also pray that he be transfer to Lafayette Parish Correctional Center (due to his mental illness) so that he may restart the life-saving hepatitis C treatment ASAP! He pray that a mental-health worker be call to the alleged incident prior to being gased by security. And anything allowed by law.

Executed at Angola, La., on this 10th day of September, 2012.    09/10/2012                    27/28

Submitted by

/s/ _____

GREGORY JEANLUVIS #121753
CAMP J, GATOR 1R3
LOUISIANA STATE PRISON

P. S.

Jeanlouis pray that he be
give state-issue clothing
ASAP

09/10/2012                                    28/28